No. 40,276

KEITH R. BEYL, *Appellant*, v. CAPPER PUBLICATIONS, INC., a corporation, *Appellee.*

(305 P. 2d 817)

Opinion filed January 12, 1957.

*Leonard O. Thomas*, of Kansas City, argued the cause, and *Arthur J. Stanley, Jr., J. E. Schroeder, Lee E. Weeks, J. D. Lysaught, Richard Millsap* and *Robert H. Bingham*, all of Kansas City, and *William S. Padley*, of Gothenburg, Nebraska, were with him on the briefs for the appellant.

*Ralph W. Oman*, of Topeka, argued the cause, and *Willard L. Phillips* and *Thomas M. Van Cleave, Jr.*, both of Kansas City, and *Robert L. Webb, Robert A. McClure, Philip E. Buzick* and *James D. Waugh*, all of Topeka, were with him on the briefs for the appellee.

The opinion of the court was delivered by

PRICE, J.: This is an action to recover damages for an alleged libel. Count one of the petition is based upon defendant's publication of an article in The Topeka Daily Capital on May 26, 1954. Count two is based upon publication of a news story concerning the contents of the article over radio and television.

Defendant's demurrer to the petition on the ground that neither count thereof states facts sufficient to constitute a cause of action was sustained, and plaintiff has appealed.

The petition and newspaper article are set out in full as an appendix to this opinion. The article, as published, was two columns wide and included a picture purporting to be that of plaintiff. The picture was one column wide and three and one-half inches long, and underneath was the name "Keith R. Beyl." Across the chest of the man pictured was a card or plaque with the following notation on it:

"Sheriffs Office
Green River Wyo
A 637
2· 10 54"

In support of their respective positions both parties make numerous contentions, but, as we view the case, the question involved is relatively quite narrow.

On the face of things the article in question obviously is a news story based upon an interview by defendant with the attorney general relative to the operations of an alleged grain theft ring in Kansas. Much of the article directly quotes the attorney general, and the remainder summarizes the information given by that official.

We consider it unnecessary to attempt a lengthy discourse on the law of libel, the freedom and liberty of the press, or the rights and liabilities of a newspaper with respect to the many and varied circumstances in which the question may arise. For a scholarly and basic discussion of the general subject we direct attention to the leading case of *Coleman v. MacLennan,* 78 Kan. 711, 98 Pac. 281, 130 Am. St. Rep. 390, 20 L. R. A. (N. S.) 361. We will attempt to confine ourselves to what we consider to be the precise question presented.

The rule is well established that it is within the qualified privilege of a newspaper to publish in good faith as current news all matters

involving open violations of law which justify police interference, and matters in connection with and in aid of the prosecution of inquiries regarding the commission of crime, even though the publication may reflect on the individuals concerned and tend to bring them into public disgrace. (33 Am. Jur., Libel and Slander, § 167, p. 161.)

By this is not meant that a newspaper is possessed of free rein and immunity to print unfounded and unwarranted scurrilous, unscrupulous and defamatory statements about a citizen, but it is entitled, in the public interest and dissemination of news, within good faith limitations of fair comment, to publish the news pertaining to such matters as are involved here, particularly when, as here, the source of information is the highest law-enforcement officer of the state.

Where facts are not in dispute, and on demurrer they of course are admitted, the question whether a publication complained of is privileged is a question of law to be decided by the court. (*Stone v. Hutchinson Daily News*, 125 Kan. 715, 266 Pac. 78, 58 A. L. R. 718; *Faber v. Byrle*, 171 Kan. 38, 229 P. 2d 718, 25 A. L. R. 2d 1379.) There can be no doubt but that under the facts here alleged the defendant has what is known and referred to in the law of libel as a qualified or conditional privilege.

The fact of the privilege appearing on the face of the petition, it may be taken advantage of by demurrer. (*Klover v. Rugh*, 99 Kan. 752, 162 Pac. 1179.)

In the Coleman case, *supra* (p. 741), it was held that if the publication be conditionally privileged the plaintiff must prove malice —actual evilmindedness, or fail. In the Stone case, *supra* (Syl. 6), it was said that malice cannot be inferred and is not to be presumed from a publication that is held to be qualifiedly privileged. In *Steenson v. Wallace*, 144 Kan. 730, 734, 62 P. 2d 907, it was said that with respect to a publication conditionally privileged a plaintiff is obliged to allege and must prove express malice. In the Faber case, *supra* (Syl. 6), it was held that there is no liability on a conditionally privileged communication, absent the existence of malice, and that in such a case the burden of proof is on the plaintiff to establish malice. In other words, when a qualified or conditional privilege exists with respect to a publication one seeking to recover damages therefor must allege and prove actual malice.

Applying the foregoing rules to the facts before us it is clear

that count one of the petition is fatally defective in that it fails to charge defendant with actual malice—that is, evilmindedness and an intent to injure. The most that can be said is that it charges the published statements were false. It is not even alleged that defendant published the article with knowledge of its falsity.

And neither can plaintiff's contentions with respect to the headline of the article and the accompanying picture be sustained. The headline and body of the article must be read and considered together. The headline in question is a fair index of what follows in the article, and even though it might be said to exaggerate the character or conduct of the matter described in the article, such fact would not in itself show express malice and prevent the defendant from interposing the defense of conditional privilege. (*Jerald v. Houston,* 124 Kan. 657, 261 Pac. 851; *Steenson v. Wallace, supra* [p. 734.]) What has been said also applies substantially with reference to the picture accompanying the article. It is clear that under the facts and circumstances the publication of the picture also was conditionally privileged. Plaintiff himself does not deny its authenticity, but merely alleges that if it is his picture it was taken by a Wyoming sheriff at a time when he was arrested and fined on a misdemeanor charge.

For the reasons stated, as to count one of the petition the demurrer was properly sustained.

Count two of the petition is allegedly based on negligence and the provisions of G. S. 1955 Supp. 60-746a. As pertinent here, that statute, in substance, provides that the owner, licensee or operator of a visual or sound radio broadcasting station or network of stations shall not be liable in damages for any defamatory statement or matter published or uttered as a part of a visual or sound radio broadcast by one other than such owner, licensee or operator, or their agents or employees, *unless* the complaining party shall allege and prove that such owner, licensee, operator, or such agent or employee, failed to exercise due care to prevent the publication or utterance of such statement or matter in such broadcast.

A short answer to plaintiff's contention is that nowhere in either count of the petition is it alleged that this defendant published or caused to be published by radio or television the matter complained of. It is not even alleged that defendant was the owner, licensee or operator of a television or radio broadcasting station at the time in question. In ruling on a demurrer we are not concerned with

what the proof may be, but are limited to what is alleged in the petition.

As to count two of the petition the demurrer was properly sustained.

Much more on the subject matter of this lawsuit could be said, but it is considered unnecessary for a proper disposition of this appeal.

The judgment of the trial court is affirmed.

FATZER and HALL, JJ., not participating.

## APPENDIX

## PETITION

### COUNT ONE

Comes now the plaintiff and, for his first cause of action against the defendant, states and alleges:

1. Plaintiff is a citizen and resident of the State of Nebraska, living and residing in the City of Cozad, and that his post-office address is Cozad, Nebraska.

2. That the defendant is a corporation organized according and pursuant to the laws of the State of Kansas, and is engaged in the business of publishing newspapers in the State of Kansas. That one of said newspapers so published by the defendant is the Topeka Daily Capital and that the defendant was engaged in publishing said newspaper on the 26th day of May, 1954.

3. That on the 26th day of May, 1954, the defendant published in the Topeka Daily Capital a newspaper article and a picture purporting to be a picture of the plaintiff, photostats of said newspaper article and picture being attached hereto, marked Exhibit "A" and hereby made a part hereof.

4. That the defendant intended to charge, and did charge, by the aforesaid publication that the plaintiff had engaged in committing the crimes of larceny, grand larceny and burglary in the States of Kansas, Nebraska, South Dakota, Iowa, Idaho, and Utah. That the plaintiff was not guilty of the crimes of larceny, grand larceny and burglary in Kansas, or elsewhere, and that the charge was false.

5. That the said defendant charged, and intended to charge, by said publication, that the plaintiff had confessed to said charges

of larceny, grand larceny and burglary, and that he had many accomplices, and that said statements were each false; that the plaintiff had not confessed to any crime and had not and could not have therefor named any accomplices thereto.

6. That the said article charged that the plaintiff had an accomplice, who was in jail in Nebraska. That said charge is false and that plaintiff had not such accomplices, and that no accomplice of the plaintiff is, or was, in jail in Nebraska, or elsewhere.

7. That the defendant intended to charge, and did charge, that the plaintiff was a member of a "theft gang" and that as a matter of fact, he was a "key man" or "leader" of said "theft gang" engaged in stealing grain in Kansas, and elsewhere, and selling stolen grain in Kansas, and elsewhere, and that said charge was false. The plaintiff was not a member of a "theft gang" and was not, and therefore could not have been a "key man" in any "theft gang" and he did not steal wheat in Kansas, or elsewhere.

8. That the defendant, by said article, intended to charge, and did charge, that the plaintiff had stolen wheat in Russell, Nemaha, Marshall, Rawlins, Greeley and Sheridan Counties in Kansas, worth $5,000.00 to $6,000.00, and one thousand bushels of corn, and that said charges were each false.

9. That the said defendant, by said publication, intended to charge, and did charge, that the plaintiff had admitted that he and associates had perpetrated thefts in the Salt Lake Valley around Logan, in the vicinity of Malan, Idaho, and had hauled stolen grain to Nebraska, and had admitted that they stole grain in the States of South Dakota, Nebraska and Kansas, and had hauled it back to the Salt Lake area, and in some instances to California, and that said charges were all false, and that plaintiff had not made any such admission.

10. That the picture, appearing as part of the said article, purports to be, and was believed by persons reading said article to be, a picture taken of the plaintiff after conviction and incarceration for felony, and that the defendant well knew that such would be, and was intended to be the belief of the readers of said newspaper, but that in truth and fact, the plaintiff has never been convicted of a felony, and that the plaintiff believes that if the picture is a picture of the plaintiff, the said picture was taken by a Wyoming Sheriff, at a time when the plaintiff was arrested and fined $10.00 on a misdemeanor charge for overloading, and that the said picture was privileged, that plaintiff did not consent to its publication, and

that the defendant had no right to publish said picture, and in particular, had no right to publish said picture in connection with the charge against this plaintiff that he was guilty of numerous felonies, and that the said picture, in and of itself, and in connection with said article, holds the plaintiff up to ridicule and conveys to, and was intended to convey to the readers of said paper, information and belief that the plaintiff had been convicted of a felony.

11. That the newspaper published by the defendant has now, and on said date had, a large circulation in the State of Kansas, is the official State paper of the State of Kansas, and circulated and was on said date read in every county in said state, and in the State of Nebraska, including the South Central portion thereof. That the article hereinabove set forth was seen and read by friends, acquaintances and business associates of the plaintiff, and by and was copied by other newspapers and by the Associated Press, and by and was given wide publication in the middlewest and other newspapers, and by radio and by television, and that as a result of the aforesaid false and defamatory publication, the plaintiff has been injured in his reputation and good name and has been held up to public and private ridicule and contempt.

12. That at the time of the publication, the plaintiff was the owner of two tractors and semitrailers, each of which was mortgaged; that the holders of the notes secured by the said mortgages foreclosed after the aforesaid article was published, and that plaintiff thereby lost his equity in said equipment worth the approximate sum of $10,000.00 That at all times plaintiff, after said publication, found it difficult, and in many instances impossible, to conduct ordinary business negotiations with those he had formerly dealt, or to engage in familiar said activities, and the plaintiff has been unable to engage in business to the extent that he had theretofore engaged in business, that plaintiff has been, as a result of said publication, humiliated, ostracized, and ridiculed, all to the plaintiff's damage in the sum of Fifty Thousand ($50,000.00) Dollars.

COUNT TWO

Comes now the plaintiff and, for his second cause of action against the defendant, states and alleges:

1. The plaintiff adopts herein, as though set forth in full, all of the allegations of his first cause of action.

2. Plaintiff alleges that this defendant carelessly and negligently failed to ascertain whether or not the statements made by Harold

R. Fatzer, quoted in the aforesaid publication, were true or false, and they have carelessly and negligently failed to make any investigation of said statements whatever and that if any investigation had been made, the defendant would have ascertained that the said charges were false.

WHEREFORE, plaintiff prays that judgment be entered against the defendant, and in favor of the plaintiff, for the sum of Fifty Thousand ($50,000.00) Dollars and costs.

### EXHIBIT A

#### GRAIN THEFT RING BROKEN IN KANSAS

The "key man" in a $60,000 grain theft shuttle system has been caught and will go to preliminary hearing today at Atwood, Atty. Gen. Harold R. Fatzer said Tuesday.

Fatzer identified him as Keith Richard Beyl, 30, of Cozard, Neb., and Salt Lake City.

Four semi-trailer trucks used in the grain thefts in Kansas, Nebraska, South Dakota, Iowa, Idaho, and Utah also have been detained, Fatzer said.

Kansas Bureau of Investigation officers and state police of the other states had been working on the thefts since January.

Beyl was arrested by KBI and Nebraska State Patrol officers near North Platte, Neb., early the morning of May 14. Fatzer said Beyl was taken to Atwood, the county seat of Rawlins County, where he confessed "to various operations in Kansas and named several accomplices who are now being sought by KBI."

Beyl is now being held in the Rawlins County jail at Atwood on charges of grand larceny and burglary. He was unable to make $5,000 bail.

Detainers also have been filed against Beyl at Tribune and Hoxie, Kan., Grand and Beaver City, Neb., Logan, Utah, and Lana, Idaho.

Fatzer said one of Beyl's accomplices is in jail at Holdredge, Neb., and that extradition to Kansas is planned. The attorney general said he did not have the accomplice's name, but that grand larceny charges will be filed at Atwood.

The grain theft gang, Fatzer said, stole grain in Kansas and other states in this area and hauled it to the Salt Lake City vicinity for sale. Then, working a shuttle system, the gang stole grain in Utah and Idaho and sold it in Nebraska, Fatzer said.

In Kansas, grain thefts were reported from Russell, Nemaha, Marshall, Rawlins, Greeley, and Sheridan Counties. Fatzer said

between $5,000 and $6,000 worth of wheat and some 1,000 bushels of corn had been stolen in Kansas.

The first reported theft was about 600 bushels of wheat in Russell County on January 24. Then came two corn thefts of 450 to 500 bushels each from CCC bins near Seneca and Marysville. On March 26 between 650 and 700 bushels of wheat were taken from a farm granary in Rawlins County.

"In all instances," Fatzer said, "it was apparent that large semi-trailer trucks were used to haul the wheat away and that the thieves had their own augertype grain loaders to load the wheat on their large trucks."

Even after KBI officers were investigating, 600 bushels of wheat were taken from a bin near Tribune and 600 to 650 bushels of wheat from a farm northeast of Hoxie.

"In all cases KBI agents and local sheriffs were able to secure plaster casts of tire tracks made by the trucks in question," the attorney general said. "Comparisons with tire track evidence secured by state authorities in South Dakota and Nebraska definitely indicated that the same gang of thieves was operating in those states."

Just before the Rawlins County theft a large truck trailer outfit was parked for several days on a side street in Norton. On the night of the theft at Atwood, March 26, the truck bearing Idaho and Wyoming tags disappeared. Fatzer said the Norton chief of police had jotted down the license numbers. These were traced, while investigations of grain buying agencies in Nebraska, Colorado, and Utah continued.

Fatzer said it was "finally ascertained" that Beyl "had made deliveries of wheat and corn elevators in Nebraska and Salt Lake City within a day or two, in each instance after the various thefts occurred in Kansas."

The attorney general said that Beyl, during questioning, admitted that he and his associates had operated from Salt Lake City, "perpetrating thefts in the Salt Lake valley around Logan in the vicinity of Malan, Idaho, and hauling stolen grain from that area to grain operators in Nebraska in the Cozard and Omaha areas."

"After delivery of grain from the west, they would steal grain in the central states of South Dakota, Nebraska and Kansas and haul it back to the Salt Lake area and sell it to the grain dealers there," Fatzer said. "In one instance several truckloads were hauled as far west as California and sold at Sacramento."