No. 41,384

John Stice, *Appellant*, v. The Beacon Newspaper Corporation, Inc., *Appellee*.

(340 P. 2d 396)

Opinion filed June 13, 1959.

*A. D. Weiskirch*, of Wichita, argued the cause, and *C. H. Morris* and *Theodore H. Hill*, both of Wichita, were with him on the briefs for appellant.

*Emmet A. Blaes* and *Harry L. Hobson*, of Wichita, argued the cause, and *W. D. Jochems, J. Wirth Sargent, Roetzel Jochems, Robert G. Braden, J. Francis Hesse, James W. Sargent, Stanley E. Wisdom, Vincent L. Bogart, Cecil E. Merkel* and *John W. Brimer*, all of Wichita, were with them on the briefs for appellee.

The opinion of the court was delivered by

Fatzer, J.: This was an action to recover damages for alleged libel published in defendant's daily newspaper, *The Wichita Beacon*.

Plaintiff alleged that from January 24, 1957, to February 4, 1957, the defendant newspaper printed, published and circulated to its

105,000 subscribers certain articles with accompanying headlines and pictures of and concerning him which were libelous, defamatory, malicious and untrue. It was alleged that said articles falsely, maliciously and wrongfully impute that plaintiff, an attorney at law and a judge of the court of common pleas in Sedgwick county, was a criminal, was dishonest, was guilty of misconduct, lacked integrity for pecuniary consideration, and was unfit to serve as a judge; that headlines accompanying the articles were not a fair index for their contents, and that plaintiff's picture printed in one article posed him with known criminals and persons under investigation and constituted an invasion of his right of privacy. It was further alleged that the false, malicious and wrongful charges and imputations were known by defendant to be false or by the exercise of due diligence should have been so known. Plaintiff then alleged damage and injury to his reputation and profession, physical discomfort, embarrassment and mental suffering, and prayed for compensatory and punitive damages in the total amount of $1,000,000.

Articles alleged to be libelous, exhibits "A" to "P" inclusive, were attached to and made a part of the petition. The articles concerned an investigation by the Wichita police department and the smashing of an organized burglary ring in Wichita in which plaintiff was implicated as gang leader. The initial article, published on January 24, 1957, appeared under a banner headline, reading: "WICHITA JUDGE, ATTORNEY IMPLICATED IN LOCAL BURGLARY GANG, POLICE SAY," and a two-column wide subheading, reading: "John Stice, Roy Trail to Face State Charges." The article also carried a three-column subheading, reading: "Named in Police Burglary Probe," under which were the pictures of the fifteen individuals implicated, including plaintiff's picture. The body of the article referred to statements attributed to police officers who reported that their informants pointed to plaintiff as the leader of the burglary gang, and contained specific statements to police by an informant member of the gang reporting a conversation overheard between plaintiff and a member of the gang with respect to a "small inner-safe" taken in one of the burglaries, which, when taken into custody by the police later that same day, contained $2,300 in cash and checks; also another statement to police Detective Briggs by a former gang member that the plaintiff had demanded $1,000 "advance fees" from money believed taken in the Farha Village Food Mart burglary; likewise, a statement by Detective Briggs who cracked the ring, and the statement by police that state burglary warrants would be

sought for each member of the gang. The article also contained a statement by the chief of police that Detective Briggs had completed a commendable piece of work in breaking up the burglary gang and would be cited for his services. Included in the article was a short biographical background of the plaintiff and Roy Trail, who, the article states police said, were the ringleaders of the organized burglary gang.

Subsequent articles contained reports of the continuing investigation by Wichita police and of later developments; of the city manager's request for the attorney general of Kansas and the Kansas Bureau of Investigation to enter the investigation and of their assisting in the case; of items referring to action taken by the attorney general and statements that he intended to push the burglary probe and would investigate the "propriety of actions" on the part of the plaintiff; the arraignment of three of the burglary suspects before the plaintiff as judge of the court of common pleas, who himself was under investigation by local and state law enforcement agencies for his connection with the burglary ring; of the continuance of the probe of the burglary gang and of Detective Briggs' statement that some twenty persons were linked with the gang which was responsible for more than twenty burglaries in which an estimated $30,000 had been lost, reference again being made that plaintiff was a part of the burglary gang; that state warrants were expected for the widespread burglary gang; that the parade of suspects in the burglary ring was growing; of the arrest of one Gleason in connection with a $10,000 safe burglery at the Pawnee IGA Market and that the plaintiff was under investigation; further, that Mrs. Justice, whose husband was a Wichita bondsman and the first informant on the gang and who was named by police as a member of the burglary ring, had received telephone calls threatening her life if she did not "shut up" her husband.

Plaintiff filed an amended petition in which he incorporated the allegations of the original petition, following which defendant's motion to strike and to make definite and certain was sustained in part and overruled in part. In compliance with the court's order, plaintiff fi'ed an amendment to his amended petition setting forth with particularity the portions of the articles alleged to be untrue, and alleged that exhibits "A" to "P" inclusive "should have been known by the defendant to be untrue." The defendant moved to strike certain portions of the amendment upon the ground that the material contained in such portions was irrelevant and immaterial,

which was sustained in part and overruled in part. Thereafter defendant filed a demurrer to plaintiff's amended petition upon the ground that it did not state facts sufficient to constitute a cause of action against the defendant and in favor of the plaintiff, which was sustained; hence this appeal.

Plaintiff contends that the publications summarized above are libelous *per se;* that malice of the defendant is therefore implied, and that any defense of privilege must be pleaded by answer. The contention cannot be sustained. Conceding that, as plaintiff asserts, the articles are libelous *per se,* the question whether a publication is privileged is a question of law to be decided by the court (*Stone v. Hutchinson Daily News,* 125 Kan. 715, 266 Pac. 78; *Faber v. Byrle,* 171 Kan. 38, 229 P. 2d 718), and although privilege is a matter of affirmative defense to a libel action, when the petition shows upon its face that the publication was privileged and the ultimate facts of actual malice are not alleged, a demurrer to the petition will lie (*Klover v. Rugh,* 99 Kan. 752, 162 Pac. 1179; *Beyl v. Capper Publications, Inc.,* 180 Kan. 525, 305 P. 2d 817).

The term "privileged" as applied to a publication alleged to be libelous means simply that the circumstances under which the publication was made are such as to repel the legal inference or presumption of malice, and to place upon the plaintiff the burden of affirmatively pleading and proving its actual existence beyond the mere falsity of the charge (*Kirkpatrick v. Eagle Lodge,* 26 Kan. 384; *Richardson v. Gunby,* 88 Kan. 47, 127 Pac. 533). A privileged communication is often divided into two classes: absolute privilege, and conditional or qualified privilege. It has been held that absolute privilege is recognized as applying to cases in which the public service or the administration of justice requires complete immunity as in legislative, executive and judicial proceedings, the occasion for the immunity being not so much for those so engaged as for the promotion of the public welfare (*Redgate v. Roush,* 61 Kan. 480, 59 Pac. 1050, 48 L. R. A. 236; *Marney v. Joseph,* 94 Kan. 18, 145 Pac. 822, Ann. Cas. 1917 B 225; *Baker v. Haldeman-Julius,* 149 Kan. 560, 564, 565, 88 P. 2d 1065; 53 C. J. S., Libel and Slander, § 87, pp. 141, 142; 33 Am. Jur., Libel and Slander, § 125, p. 123).

Generally speaking, qualified privilege exists in a larger number of cases than does absolute privilege. A privileged publication is one made on an occasion which furnishes a prima facie legal excuse for making it unless some additional facts are shown which alter

the character of the publication. It comprehends communications made in good faith, without actual malice and with reasonable or probable grounds for believing them to be true. Briefly stated, a qualifiedly privileged publication is a defamatory publication made on what is called an occasion of privilege without actual malice, and as to such publications, there is no civil liability regardless whether the publication is libelous *per se* or libelous *per quod.* The fact that a publication is qualifiedly privileged does not change the actionable quality of the words published, although, as previously indicated, such a publication rebuts the inference or presumption of malice and falsity which would otherwise arise as a matter of law, still leaving, however, the party responsible if both falsehood and actual malice are affirmatively pleaded and proved; that is, actual malice is not inferred or presumed from the injurious character of a qualifiedly privileged communication, and the injured party must allege and prove that the statements were made with malice—actual evil-mindedness or specific intent to injure. (*Kirkpatrick v. Eagle Lodge,* supra; *Baker v. Haldeman-Julius,* supra; *Richardson v. Gunby,* supra; *Coleman v. MacLennan,* 78 Kan. 711, 98 Pac. 281, 20 L. R. A. [n. s.] 361; *Carver v. Greason,* 104 Kan. 96, 177 Pac. 539; *Majors v. Seaton,* 142 Kan. 274, 46 P. 2d 34; *Stone v. Hutchinson Daily News,* supra; 53 C. J. S., Libel and Slander, § 89, pp. 143, 144; 33 Am. Jur., Libel and Slander, § 113, p. 115.)

It is well settled in this jurisdiction that newspapers have a qualified privilege to publish as current news all matters involving open violations of the law which justify police interference, and matters in connection with inquiries regarding the commission of crime, even though the publication may reflect on the individuals concerned and tend to bring them into public disgrace (*Beyl v. Capper Publications, Inc.,* supra, and authorities cited therein). The conditional privilege to publish matters which are of legitimate public concern applies also to information concerning the conduct of a candidate for public office (*Coleman v. MacLennan,* supra, 130 Am. St. Rep. 390, 20 L. R. A. [n. s.] 361), as well as to publications concerning the conduct of an incumbent public official (*Steenson v. Wallace,* 144 Kan. 730, 62 P. 2d 907).

In *Coleman v. MacLennan,* supra, the defendant published an article about the plaintiff, the incumbent attorney general who was a candidate for re-election, concerning his official acts. The article

purported to state facts but made comments and drew inferences. It was held that an untrue, derogatory statement published in good faith and without malice with respect to a candidate for public office was not grounds for the plaintiff to recover damages. In *Steenson v. Wallace*, supra, it was said:

". . . The publisher had precisely the same conditional privilege to inform the public of conduct of the county attorney as a public officer that he would have had if plaintiff had been merely a candidate for office, and it would be a strange rule which would limit a newspaper to exposing conduct merely deserving of censure, but not criminal." (1. c. 734.)

In the instant case the subject of the articles was a public official, and so much of his private character as affects his fitness for public office is subject to a wider latitude of public scrutiny and discussion than that of a private citizen. The articles about which plaintiff most vigorously objects were obviously news stories based upon interviews of police officials and reports of the police department concerning the operation of a burglary ring in Sedgwick and adjoining counties. There is no question but that the articles, when considered in their entirety, indicate they were "open violations of law justifying police interference," and concerned "matters in connection with and in aid of the prosecution of inquiries regarding the commission of crime." All of the exhibits attached to the petition make that obvious. Whether plaintiff was involved is immaterial for present purposes. While the articles concerned plaintiff's conduct and involved matters in connection with inquiries regarding the commission of crime with which he was reportedly connected, those articles were based upon information obtained from the police department and other investigation agencies and from various public officials who had a legitimate concern with the matters under investigation. Indeed, excerpts from specific statements contained in the articles were directly attributed to statements from the police department—for instance, "police say," "detective said," "Briggs (a detective) said," "named as," "police investigation has revealed," "implicated by police investigation," "detectives disclosed," "investigations are continuing," "according to the police evidence," "according to Detective Briggs" and "under investigation by law enforcement officials." Moreover, exhibits G, I, N and P are news items referring directly to statements and acts of the attorney general in connection with his investigation of the burglary ring. In our opinion, the petition and exhibits clearly show upon their face that the publications complained of fall within

the rule announced in *Beyl v. Capper Publications, Inc.,* supra, and were qualifiedly privileged.

The remaining question is whether plaintiff's amended petition alleges actual malice—evil-mindedness, or intent to harm on the part of the defendant. Giving the allegations of the amended petition all inferences to which they are entitled, we conclude that it does not. Although plaintiff alleged several times the articles were printed and published "maliciously" and "wrongfully" there are no factual allegations of actual malice or evil-mindedness with intention to harm. Malice is merely a conclusion of law which is based upon facts. Standing alone, allegations of "maliciously" and "wrongfully" are mere conclusions. Where a petition in a libel action discloses facts constituting a qualified privilege thus necessitating the pleading of actual malice to render such a communication actionable, it has been held that a mere averment that the words printed or published were malicious, is not sufficient (53 C. J. S., Libel and Slander, § 166b, p. 262). The use of denunciatory adverbs such as "maliciously" and "wrongfully" will not suffice to plead a cause of action where the petition discloses facts constituting a qualified privilege. To withstand a demurrer, the plaintiff must allege the ultimate facts constituting actual malice. It is not sufficient that a fact may be inferable from the facts alleged, where it is not implied (*Ladd v. Nystol,* 63 Kan. 23, Syl. ¶ 1, 64 Pac. 985; *Dowell v. Railway Co.,* 83 Kan. 562, Syl. ¶ 4, 112 Pac. 136; *Brane v. First National Bank,* 137 Kan. 403, 404, 20 P. 2d 506; *Smith v. Bridgeport Machine Co.,* 151 Kan. 444, 100 P. 2d 65; *Snyder v. McDowell,* 166 Kan. 624, 203 P. 2d 225; *Bishop v. Sewer District No. 1,* 184 Kan. 376, 383, 336 P. 2d 815).

The allegations in the amendment to the amended petition that the specific statements relied upon were untrue and should have been known by the defendant to be untrue, do not change this conclusion. However, under proper allegations, a newspaper may be charged with libel where, as here, the petition discloses upon its face that the publication was qualifiedly privileged when the ultimate facts constituting actual malice, evil-mindedness, or a wicked purpose to injure the plaintiff are fully alleged, but, they were not so alleged in plaintiff's amended petition.

Furthermore, we cannot say the headlines accompanying the articles were not a fair index of their contents, and the court is

obliged to say the headlines did not exaggerate the character of conduct described in the articles (*Steenson v. Wallace,* supra). If they did, mere exaggeration would not show express malice and prevent defendant from enterposing the defense of qualified privilege (*Carver v. Greason,* supra).

Finally, plaintiff alleged that his picture published in the first article violated his right of privacy. During argument of this appeal counsel stated plaintiff makes no contention of violation of his right of privacy, consequently, that allegation is considered as abandoned.

The conclusions heretofore announced require the holding that plaintiff's amended petition and the amendment thereto did not state a cause of action in favor of the plaintiff and against the defendant, and the trial court did not err in sustaining the defendant's demurrer.

The judgment is affirmed.